Kevin **BRUNER,** Plaintiff and Appellee,

v.

Michelle **HAGER,** f/k/a Michelle Jaeger, Defendant and Appellant.

Civ. No. 940322.

Supreme Court of North Dakota.

July 27, 1995.

---

Richard B. Baer (argued), Bismarck, for plaintiff and appellee.

Thomas M. Tuntland (argued), Mandan, for defendant and appellant.

MESCHKE, Justice.

Michelle Hager appealed a decree placing primary custody of her son, Dillon Bruner, with Kevin Bruner, his father. We reverse and remand for more specific findings on domestic violence and for a redetermination of custody.

Kevin Bruner and Michelle Hager moved in together in early 1990, never married, and lived together for nearly three years. When they began, Michelle had three children from her prior marriage, and Kevin had a child from a prior relationship. On September 16, 1991, Michelle gave birth to Dillon, their son.

In February 1993, Kevin moved out and sued Michelle for custody of Dillon. Michelle also sought custody with child support. Kevin obtained interim primary custody of Dillon but, in February 1994, the trial court modified it to equalize temporary physical custody of Dillon between his parents on alternating weeks. After trial in August 1994, the trial court scheduled visitation for Michelle and placed the primary physical custody of Dillon with Kevin.

On appeal, Michelle argues that the trial court erred "in failing to find that [Kevin] was the perpetrator of domestic violence thereby giving rise to a presumption that he should not be awarded joint or sole custody" and "in awarding him custody without finding by clear and convincing evidence that the best interest of the child required his participation as a custodial parent." We agree with Michelle's arguments.

We affirm a trial court's custody decision, a finding of fact, unless the court clearly erred. *Heck v. Reed,* 529 N.W.2d 155, 159 (N.D.1995). "A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if no evidence exists to support it, or if the reviewing court, on the entire evidence, is left with a definite and firm conviction that a mistake has been made." *Id.* Here, faced with evidence of Kevin's abusiveness, the trial court minimized it, did not expressly recognize the statutory presumption against placing custo-

dy with a violent parent, and did not consider the need for clear and convincing evidence to overcome the presumption against Kevin's custody.

Michelle testified that her life with Kevin "was a rocky relationship from the beginning," and she described four instances of Kevin's violent behavior towards her:

The first time was a black eye at his parent's place. We had been out drinking. He was upset that I was talking to somebody else. I was trying to talk to Kevin but he wouldn't accept it as that. He told everybody I hit my own eye on the gun scope.

. . . . . . . . . .

. . . . There was a time before the black eye though. . . . He wouldn't let me go and he had ripped my shirt because I had tried to get away. He wouldn't let me get away and we had a confrontation there, and the third time was when we came home, he told me to settle down and tried to go out the door and he picked me up and threw me on the floor and sat on top of me. The last time was in May.

. . . . The eleven year old was fighting with the eight year old over a package and he grabbed the eleven year old by the shoulder and neck together and I told him to let go of him, and then I went out and pushed him away from him. After I pushed him away from my son, he hit me and I got upset and I called the cops, and as soon as I called the cops, he took off.

Michelle, Kevin, and other witnesses also described Kevin's threatening behavior and repeated violence towards the mother of Kevin's first child, besides toward an acquaintance, a relative, and Michelle's new boyfriend.

Kevin reluctantly admitted three instances of his violence towards Michelle: "[S]he slapped me and . . . I slapped her back." "[T]hen one time during deer hunting we were drinking and we had gotten into an argument or whatever it was, about the same thing there too." "Yes, when I had slapped her, I ruptured her eardrum, I guess. . . . I don't know if I blackened [her eye] or she did it herself, or what."

The most relevant part of the law governing placement of custody directs:

In awarding custody or granting rights of visitation, the court shall consider evidence of domestic violence. If the court finds credible evidence that domestic violence has occurred, this evidence creates a rebuttable presumption that a parent who has perpetrated domestic violence may not be awarded sole or joint custody of a child. This presumption may be overcome only by clear and convincing evidence that the best interests of the child require that parent's participation as a custodial parent.

NDCC 14–09–06.2(1)(j) (part). A connected statute defines domestic violence as "physical harm, bodily injury, assault, or the infliction of fear of imminent physical harm, bodily injury, or assault, not committed in self-defense, on the complaining family or household members." NDCC 14–07.1–01(2). A rule of evidence explains "the presumption substitutes for evidence of the existence of the fact presumed until the trier of fact finds from credible evidence that the fact presumed does not exist." NDREv 301(a). However, the statute on custodial factors directs, at NDCC 14–09–06.2(1)(j), that the presumption can be "overcome only by clear and convincing evidence" that the best interests of the child "require" placement with the violent parent.

In its decision, the trial court made minimal findings about Kevin's "abusive" conduct and improperly compared it to Michelle's disturbed, but non-violent, conduct:

The primary problem in [Kevin]'s life is his explosive temper. It has been satisfactorily shown to the Court that in the past, he has become abusive in certain situations. These always appeared to be related to drinking or the use of drugs, but all those actions seem to have terminated a few years back. . . .

[Michelle] has exhibited substantial problems as well in the past. She has in the past had problems with depression, food disorders and because of the feeling of low self-esteem, has sought out reinforcement from other men on a regular basis.

■ In the findings of fact, the trial court excused Kevin's "abusive" behavior as past, minimal, and not directed towards his son:

13. . . . [Kevin]'s association with drugs has terminated some years ago. Although [Kevin] does use alcohol, his use of it is minimal at this time.

14. That Dr. Hanlon's report on Kevin does not give reason for any concern regarding Kevin's use of drugs, alcohol or his ability to parent this child.

15. That there is no evidence that Kevin is or has been abusive to Dillon in any way, or placed him in harm's way.

These findings are similar to ones we have concluded are insufficient to rebut the presumption against custody by a violent parent. *Heck v. Reed,* 529 N.W.2d 155. The findings are insufficient here, too.

The finding that Kevin did not abuse Dillon doesn't rebut the presumption. "If the legislature had intended a distinction be drawn between the adverse impact of the violence directed at a parent but not a child, it would not have defined 'domestic violence' as harm to family and household members, but would have used a more limiting phrase such as 'child abuse.'" *Id.* at 163. As Justice Levine amply explained in *Heck v. Reed,* the fact that a parent has not abused the child, only the child's other parent, does not avoid the effect of the presumption.

The trial court seemed to blame Michelle more for her non-abusive conduct:

That Michelle has had problems as well such as depression, food disorders (Bul[i]mia Nervosa), and low self-esteem. She has a history of seeking out other men for reassurance, e.g. her first marriage ended because of her relationship with at least one other man. Her relationship with [Kevin] included another man. Her counsellor Mr. Greg Arbach has described her prognosis as guarded.

The trial court ordered separate counselling for Michelle and Kevin as a common solution for their divergent misbehaviors. We pointed out in *Heck v. Reed,* 529 N.W.2d at 165 n. 6: "Although treatment is not a fail-safe remedy, it may, in certain circumstances, support a finding that domestic violence is not likely to occur in the future." In *Krank v. Krank,* 529 N.W.2d 844, 849 (N.D.1995), we similarly concluded that a violent parent, who "introduced no evidence" that "he had considered or participated in any form of treatment program or counseling for domestic violence," was still disqualified by the presumption against his custody. Without proof of prior rehabilitation through counseling and treatment, compulsory counseling in the future cannot safeguard against the presumptive effects on the child of custody by a violent parent.

■ A trial court cannot treat the violence-presumption as simply another factor in custody. To do so would impermissibly continue the precedential effect of the superseded decision in *Schestler v. Schestler,* 486 N.W.2d 509 (N.D.1992). The *Schestler* view was clearly rejected by the 1993 Legislature's amendment of NDCC 14–09–06.2(1)(j). 1993 N.D.Laws Ch. 144 § 2. Justice Levine carefully explained this in *Heck v. Reed,* 529 N.W.2d at 162, when she clarified that the 1993 amendment's effect on *Schestler* required "more than the customary weighing and reciting of the factors found in NDCC § 14–09–06.2(1)(a) through (i), (k), (*l*)." Chief Justice VandeWalle repeated in *Krank,* 529 N.W.2d at 848, that the statutory presumption is not rebutted "by weighing in the [violent parent's] favor some of these remaining customary best-interests factors."

■ The presumption places an emphasis on domestic violence as the paramount factor in a custodial placement when credible evidence of domestic violence appears. *Heck v. Reed,* 529 N.W.2d 155; *Krank v. Krank,* 529 N.W.2d 844; *Helbling v. Helbling,* 532 N.W.2d 650 (N.D.1995); *Ryan v. Flemming,* 533 N.W.2d 920 (N.D.1995). Even though the trial court did not have these expositions of the presumption when it decided this case, the trial court must nevertheless apply the presumption properly to this case. To rebut the presumption, a violent parent, like Kevin, must clearly and convincingly prove that some additional circumstances "require" placement of the child with him rather than the non-violent parent.

We reverse and remand for the necessary express findings about domestic violence and for a redetermination of custody accordingly.

VANDE WALLE, C.J., and LEVINE and NEUMANN, JJ., concur.

SANDSTROM, Justice, concurring in the result.

Domestic violence is unacceptable. I write, however, to urge we not lose sight of the best interests of the child.

The majority, referring to N.D.C.C. § 14–09–06.2(1)(j), states: "The presumption places an emphasis on domestic violence as the paramount factor in a custodial placement when credible evidence of domestic violence appears." This truncated statement omits the ultimate concern in child custody decisions—the best interests of the child.

N.D.C.C. § 14–09–06.1 still provides:

"An order for custody of an unmarried minor child entered pursuant to this chapter must award the custody of the child to a person, agency, organization, or institution as will, in the opinion of the judge, promote the best interests and welfare of the child. Between the mother and father, whether natural or adoptive, there is no presumption as to who will better promote the best interests and welfare of the child."

And N.D.C.C. § 14–09–06.2 still provides subsection (j), as well as its other subsections, are "factors affecting the best interests and welfare of the child" to be considered and evaluated by the court. The suggestion in *Krank v. Krank*, 529 N.W.2d 844, 848 (N.D.1995), that once the presumption is raised, the abusing parent may not be awarded custody unless the other parent is unfit, is contrary to the statute. If the legislature had so intended, so stating would have been a simple matter.

The best interests of the child when clearly and convincingly established still prevail over other considerations. *See* N.D.C.C. §§ 14–09–06.1 and 14–09–06.2(1). As I wrote in *Heck v. Reed*, 529 N.W.2d 155, 166 (N.D. 1995) (Sandstrom, J., concurring in the result), "clearly the legislature intended a high level of compelling evidence to award custody to a perpetrator of domestic violence."

When thus established, the best interests of children cannot be ignored, and children cannot be used to their own detriment to punish a parent.

Here, the majority recites evidence which reflects domestic violence committed by both parents. The majority then ignores the alleged violence committed by the mother, and focuses exclusively on that of the father. Subsection (j) applies equally to men and women. The stereotyped assumption that all men are more powerful and violent than all women is unworthy of our judicial system. Participants in our legal system are entitled to be judged as individuals, not based on stereotypes.

When there is credible evidence both parents have committed domestic violence, the presumption of subsection (j) applies to each. N.D.C.C. § 14–09–06.2. The implication of *Krank* at 850, that in cases of domestic violence by both parents, the violence of relationship should be somehow scored like a boxing match, with the presumption applying only against the one scoring the most points, has no basis in the statute.

I would remand for specific findings, including those relating to the domestic violence committed by each parent. In the final analysis, the trial court, guided by the statutes, should award custody based on the best interests of the child.